```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA    )
                            )
v.                          )    Criminal No. 07-10005-NMG
                            )
                            )
KELLY SMOAK                 )
```

## GOVERNMENT'S SENTENCING MEMORANDUM

The government filed this case fully cognizant of the small amount of drugs involved in the persistent offenses of conviction. The defendant was indicted in this Court based on the seriousness of his criminal record and a demonstrated proclivity for violence and the persistence of his crack cocaine trafficking. The indictment was also returned based on the area of the city in which the defendant was operating and the devastating impact that drug trafficking and the violence it breeds has had on that neighborhood.

The government acknowledges that the Court has the right to deviate from the advisory guideline range in this and any other case. It also recognizes the availability of such deviations in other career offender cases. This memorandum will therefore focus on the particular facts of this case and the specifics of the defendant's criminal record that show that the defendant is exactly the kind of "career offender" to whom Congress intended that U.S.S.G. §4B1.1 would apply.

**1. The defendant's career offender predicates**

The principal driver of the sentencing in this case is the defendant's criminal record. Kelly Smoak has four scoreable convictions for crimes of violence or drug trafficking offenses. PSR at ¶¶63 (Armed Robbery/Possession of Sawed Off Shotgun/Assault and Battery with a Dangerous Weapon), 64 (Assault and Battery), 65 (Armed Robbery/Assault and Battery/Assault and Battery with a Dangerous Weapon) 67 (Possession of Class B substance with Intent to Distribute). He therefore qualifies as a Career Offender under the advisory Sentencing Guidelines and is an individual who Congress has directed should be sentenced "at or near the statutory maximum." 28 U.S.C. 994(h). See Mistretta v. United States, 488 U.S. 361, 376 (1989) (noting that Congress provided detailed guidance to the Sentencing Commission regarding the sentencing of career offenders); United States v. Stevens, 2007 WL 2981172 (7th Cir. 2007) (in affirming sentence imposed upon career offender, Court noted that "United States v. Booker, 543 U.S. 220 (2005), does not disturb § 994(h) or [U.S.S.G.] § 4B1.1.").

Section 994(h) is not a mandatory directive that deprives the Court of authority to impose a sentence below the advisory guideline range. It is, however, an express Congressional policy judgment that "must be taken into account with several of the sentencing factors set out in 18 U.S.C. §3553(a)." United States

v. Sanchez, 517 F.3d 651, 668 (2nd Cir. 2008).  Compare United States v. Pruitt, 2007 WL (10th Cir. 2007)(in affirming sentence imposed on career offender, Court recognized that section 994(h) is not a mandatory minimum but was intended to provide a measure of flexibility;  court also noted that, in the post-Booker context, this means "if the Commission may, consistently with 28 U.S.C. § 994(h), adopt a more tailored definition, it follows that judges, in their exercise of sentencing discretion, may do the same") with United States v. Feemster, 483 F.3d 583, 587-89 (8th Cir. 2007) ("[A] district court cannot simply ignore the Congressional mandate that career offenders be sentenced at or near the statutory maximum term of imprisonment"), remanded for further consideration in light of Gall v. United States, 128 S.Ct. 880 (2008).

**2. The defendant's history of violence and prior drug trafficking**

While the fact of the defendant's predicates makes him eligible to be sentenced as a career offender, other factors that show he truly merits it.  The nature of the defendant's predicates, the punishment he received for them, his response to the criminal justice system's efforts to get him to change his behavior, and the persistence and seriousness of the offense of conviction all show that Kelly Smoak is a danger to his community a danger to himself, and must be incarcerated accordingly.

The defendant's Career Offender predicates include three

-3-

crimes of violence and one drug trafficking offense.  PSR at ¶¶ 63, 64, 65, and 67.  His first armed robbery case (at age 19) involved an attempt to rob a convenience store using a sawed off shotgun and a pellet gun.[1]  During that robbery, an innocent clerk at a Store 24 had a pistol stuck into her ribs and the defendant told her to clean out the register or he would "kill" her.  The defendant and his accomplice netted $182 and $38 in food stamps in that case.  PSR at ¶63.

The seriousness of this offense is best demonstrated by the fact that the defendant received a Superior Court sentence of 6-15 years.  Id.  While in custody for it, the defendant received *18 disciplinary reports* including one in which he sent a victim to the hospital and others involving the use of a weapon or drugs.  Id.  Although the defendant was given the opportunity to participate in various rehabilitative and treatment programs while in prison, it is not clear that he finished any of them due to his propensity for violence.  See Id. (defendant terminated from program that permitted work in law library after prison fight in which he used a lock as a weapon; also allowed to participate in Drug Interdiction/Relapse Prevention Program, Boot Camp, and Keep in Touch Program). Nor did the programs he did

---

[1] The defendant's participation in the convenience store robbery was not the first time he had associated with a firearm. On June 22, 1992, he was also found guilty of possessing a gun and ammunition several months earlier (on October 18, 1991). That conviction was placed on file.  PSR at ¶62.

-4-

participate in effect his behavior once he was released.

The defendant was released from this first period of adult incarceration on April 10, 2000.[2] Within 6 months, he was rearrested. PSR, ¶64. This time he beat Kimberly Miles on Christmas day. This incident was initiated by a 911 call from a neighbor reporting that a woman was being beaten in an upstairs apartment. The victim, of course, was the mother of the defendant's child who reported that the defendant choke, punched and slapped her and then fled before the police arrived.[3] Id.

---

[2] Prior to the time the defendant joined the adult system in 1992, he already had an extensive juvenile record. His four determinations of delinquency involved drugs, violence, and property cases, including an assault and battery on a police officer. PSR at ¶¶60-63. In the three years he was in DYS custody, he appears to have been placed in a secure DYS facility three separate times after either escaping from custody or violating the terms of his release. Id. The longest period he appears to have been lawfully on the street as a juvenile (age 14-17) was 34 days. See PSR at ¶61 (defendant released to home on 9/29/87 and returned to a secure facility on 11/3/87).

[3] This predicate is part of a larger pattern of domestic violence. The PSR describes two restraining orders obtained against the defendant by a former girlfriends in which the defendant is alleged to have threatened or beaten women. PSR at ¶¶116, 122. The defendant claims that these incidents were fabrications. Id. at 117, 123. Other indicators of domestic abuse and serious anger management issues (particularly when the defendant was using alcohol) pervade the PSR. See PSR at ¶¶69 (defendant tells arresting officer that he is "a bitch ass nigger" and warns officer that he will "get out"); 70 (defendant gets confrontational with officers in incident in which defendant's companion found to have a gun and drugs); 75 (defendant has pending domestic A&B case in which his is alleged to have attacked 60 year-old mother and pushed girlfriend away when she attempted to intervene); 90 (defendant is stabbed after "having words" with unknown males); 91 (defendant is alleged to have beaten man); 92 (police intervene in verbal dispute between

Although the defendant was released on this case despite his already serious record, he was soon re-arrested for another armed robbery. PSR at ¶65. In this second incident, he and an accomplice were alleged to have again used a firearm to rob a restaurant. Id. This of course means that the defendant spent six years in state prison only to commit the same crime within a year of his release while already on pretrial release for yet another offense. PSR at ¶63 (defendant released from prison on Store 24 robbery on 4/10/00).

The defendant's crime continued notwithstanding these arrests. Although it is not clear why he was released following his second armed robbery arrest, he was. He was then rearrested within six months when State Troopers found crack cocaine on him after a car stop. PSR at ¶67. The defendant was sentenced to 18 months on this case with all but 7 months suspended. Since being released on that case, he has been convicted on less serious charges (all of which involved use of marijuana and alcohol). Id. at ¶¶68-70. Each time, his was placed on probation and given a chance to change his behavior. Each time, he promptly violated probation and was put in jail, only to get out and commit more

---

defendant and 13 year old girl); 97 (defendant involved in altercation with girlfriend). Many of these case were never prosecuted. See generally Gavin and Puffet, "Criminal Domestic Violence Case Processing," Center for Court Innovation, 2005)(domestic violence cases are often reported to be characterized by high dismissal rates due to the failure of victims to cooperate).

crime. Id. Those crimes of course extended to the four drug charges to which he pled guilty here, all of which took place while he was on pretrial release from state court, and to the defendant's possession of marijuana in Eutawville, South Carolina while he was fleeing from the arrest warrant issued by this Court. Compare PSR at ¶¶14-31 (sales of crack cocaine on July 14, July 20, and July 27, 2006) with PSR at ¶69 (defendant arrested on June 27, 2006, approximately two weeks before first drug sale; convicted on August 27, 2006 and placed on probation which he violated twice in three months). See also PSR at ¶76 (Defendant arrested on federal arrest warrant in possession of marijuana while on pretrial release for pending assault and battery case).

There is no better indication of the seriousness of the defendant's criminal record than to consider the overall incidence of criminal conduct. The defendant first came into the criminal justice system at age 14 on January 29, 1987. PSR at ¶60. Since that time, he has been arrested 21 times on a total of 38 criminal charges. PSR at ¶¶60-87. He has been convicted (or determined to be a delinquent) of 20 crimes involving 13 separate proceedings. He has been incarcerated eight time for periods up to 15 years and given countless opportunities to change his conduct only to go out and commit crime again. He has been under some form of criminal justice supervision virtually

all of his adult life and still went out and committed the crimes at issue here.  Id.  He is thus exactly the kind of defendant Congress envisioned when it directed the Sentencing Commission to promulgate a Career Offender guideline and exactly the kind of defendant who must be incarcerated for a lengthy time to protect the public and himself.  See, e.g., United States v. Torres, 541 F.3d 48 (1st Cir. 2008)(affirming mid-range sentence of 195 months imposed on defendant who sentencing judge referred to as a "classic career offender [of the type] Congress had in mind for these long prison sentences"); United States v. Elwell, 984 F.2d 1289 (1st Cir. 1993)("five separate bank robberies, committed with the opportunity to pause and reflect between them and memorialized by convictions, are surely what Congress had in mind as identifying a career offender").

### 3. **Other aspects of the defendant's record**

Other factors confirm the seriousness of the defendant's record and thus that his is indeed a *Career Offender*. The PSR indicates that the defendant has violated probation five times despite many instances in which he was incarcerated for lengthy periods.  See PSR at ¶¶60 (violation dated 8/20/87); 61 (violation dated 9/1/9/87; 65 (violation dated 4/4/06); 69 (violations dated 10/4/06 and 11/7/06).  The defendant was on pretrial release when he committed the offenses of conviction and continued to commit new crimes even when he fled from

-8-

Massachusetts. PSR at ¶¶69, 75-76. "A defendant undermines the integrity of the criminal justice system when he commits a crime while ... under its supervision and control." United States v. Hernandez, 896 F.2d 642, 645 (1st Cir. 1990).

Worse yet, the convictions at the beginning and the end of the defendant's criminal history also appear to involve sales of street level amounts of crack cocaine in beleaguered areas of the city adversely affected by drugs and drug violence. Id. at ¶67. See also PSR at ¶70 (area of Harvard and Bernard Street identified and known gun and drug area). The defendant has also funded years of expensive drug use and a significant interest in gambling despite the absence of any verified employment. PSR at ¶138 (regular trips to Foxwoods); 140-146 (drug use history). Thus, the record suggests an extended pattern of drug trafficking far beyond the 5 transactions described in the PSR. PSR at ¶¶10-36.

All of this is compounded by the fact that the offenses of conviction took place after the defendant had been given repeated chances to reform and substantial assistance by the state court system, and had been incarcerated for periods less serious then he is facing here. PSR at ¶¶ 62-70. He was given access to programs and treatment but squandered them in favor of violence and drugs. See PSR at ¶63. The persistent commission of crime in such circumstances is a factor that would have permitted an

upward departure under settled pre-Booker law. See United States v. Tilley, 964 F.2d 66, 75 (1st Cir. 1992) (affirming upward departure based on prior lenient treatment by state courts). These remain important sentencing considerations in the post-Booker world. See generally United States v. Smith, 2007 WL 2947502, *7 (6th Cir. 2007) (imposing above guidelines sentence where it was obvious that prior incarceration "was obviously not sufficient to comply with the purposes of § 3553(a)(2)").

**4. The Defendant's Commission of New Crime While Fleeing from the Arrest Warrant in this Case and His Lies to Law Enforcement**

Another guideline consideration in this case is the defendant's flight following the issuance of the arrest warrant in this case and his lies to law enforcement when he was finally arrested in Eutawville, South Carolina three months later on April 20, 2007. As is set forth in the PSR, the defendant fled Massachusetts after the issuance of warrants in the underlying investigation and a publicized sweep of Greenwood Street defendants. PSR at ¶¶37-39; see also Shelly Murphy, "21 linked to Dorchester gang charged with drug dealing," Boston Globe, January 11, 2007 (detailing arrests and stating that those charged included Kelly Smoak) (attached as Exhibit 1). The defendant was arrested for marijuana possession and lied to South Carolina authorities about his identity and residence to avoid prosecution here. Id at ¶76.

The government concedes that the defendant's flight and lies about his identity do not give rise to an obstruction of justice enhancement. E.g., United States v. Moreno, 947 F.2d 7 (1st Cir. 1992). See also U.S.S.G. §3C1.1, Application Note 5. The Sentencing Commission has stated, however, that such misconduct "may warrant a greater sentence within the otherwise applicable guideline range. " Id. This guidance is particularly appropriate here where the defendant has a longstanding pattern of abusive behavior towards the police. See PSR at ¶63 (defendant arrested for armed robbery under the name of Billy Hudson); 69 (defendant tells arresting officer that he is a "bitch ass nigga" and reminds officer that the defendant will "get out"); 70 (after defendant is asked to leave area of liquor store at Harvard and Bernard Streets, he yells "Why you gotta fuck with us I ain't doing anything. Fuck you."). See also United States v. Wallace, 461 F.3d 15, 38-39 (1st Cir. 2006) (recognizing guidance provided by application note).

   **5.   3553(c) Factors.**

      **(A) The offense of conviction**. Another important sentencing factor in this case is the circumstances of the offenses of conviction and the impact that drug trafficking and the violence it breeds has on the citizens of the Greenwood Street area. The defendant repeatedly distributed crack in the Greenwood Street area. He did so in conjunction with Fernando

-11-

Phillips and Gerald Scott (other veterans of the criminal justice system), by himself, and using the services of Jean Janvier, a much younger (and much less experienced) individual. While the amount of drugs was obviously small, the offenses of conviction took place after the defendant had been convicted for other drug related offenses (including a prior offense for crack cocaine trafficking) and crimes of violence. E.g, PSR at ¶67. His lack of employment and acknowledgment that he is not a crack cocaine addict (but used various other drugs) also suggests that the offenses of conviction were not isolated instances. PSR at ¶¶143-44 (defendant sprinkled crack cocaine with marijuana "off and on" but used other forms of cocaine regularly); 154-157 (no verified employment); 138 (defendant had 17 documented trips to Foxwoods Casino involving total buy in of $5,500).

The damage that drug trafficking causes also shows that a lengthy sentence is required in this case. While the crack/powder disparity has been widely criticized, the defendant's guideline range here would be the same here regardless of the type of cocaine that he sold. See United States v. Richardson, 923 F.2d 13, 16 (2nd Cir. 1991) (career offender guideline "focuses on recurrence of offenses rather than on the specifics of the most recent offense") discussion above. It is also true that Court's and commentators alike have recognized the dangers of this particular drug and thus the

damage caused by crack traffickers like the defendant.  See www.cocaine.org ("Crack-cocaine delivers an intensity of pleasure completely outside the normal range of human experience" and results in a craving for more).  See also Testimony of Dr. Nora Volkow, Director, National Institute of Drug Abuse before the Senate Judiciary Committee (February 12, 2008)(among those entering drug treatment in 2005 with cocaine as their primary drug, 72% (185,236) were in treatment for smoked cocaine). Surely, these are appropriate sentencing considerations both in punishing what are serious crimes committed by a life-long criminal and in deterring the defendant and others.  See 18 U.S.C. § 3553(a)(2)(B) (the district court may impose a sentence "to afford adequate deterrence to criminal conduct").  See also United States v. Blaso, 2008 WL 227863 (3rd Cir. 2008)(affirming sentence imposed that recognized the "catastrophic consequences of crack dealing"); United States v. Taylor, 2007 WL 1224045 (7th Cir. 2007) (affirming crack cocaine sentence based on, among other things, sentencing judge's recognition that "that crack dealing is a serious crime because crack is highly destructive to its consumers").

   (B). **Impact of the defendant's crime.**  Another relevant factor in sentencing the defendant is the impact his crimes (and crack cocaine trafficking generally) has on the Greenwood Street community in which they were made.  See 18 U.S.C.

§3553(a)(1)(directing sentencing courts to consider the nature and circumstances of the offense). This Court is fully cognizant of the effect of drug trafficking in our city. The devastation that dealers like Smoak produce is of course not limited to the Greenwood Street section of Boston or the city as a whole. See generally United States Sentencing Commission, "Cocaine and Federal Sentencing Policy," (May, 2007) at 86 ("According to [Professor Alfred] Blumstein, the [40% reduction in national violence since 1993] is attributable to a reduction in new users of crack cocaine and a consequent reduction in the crack cocaine street markets.") See also Johnson, "Patterns of Drug Distribution: Implications and Issues," 38 Substance Use and Misuse 1795 (2003) cited by the Sentencing Commission for the proposition that "almost all crack cocaine related violence of the 'systemic' type, that is violence that occurs within the drug distribution process.").

The government is not seeking to lay all drug-related drug injury and related violence at this defendant's door. At the same time, the defendant's willingness to peddle crack for profit in this area after so much crime and after wasting so many opportunities to change demonstrates that he is a part of the problem seriously effecting thousands of families and individuals. He should therefore be sentenced accordingly. E.g., United States v. Crawford, 2007 WL 2436764 (E.D. Wisc.

2007)("Those who deal drugs prey upon the weaknesses of individuals and contribute to the social pathology of violence, unemployment and poverty that has become epidemic in so many of our cities. Cocaine, especially in the form of crack cocaine, has been at the center of this downward spiral over the past thirty years. While I am mindful of, and have given full consideration to, the almost universal criticism of the infamous 100 to 1 ratio between crack and powder cocaine, and the Sentencing Commission's longstanding and ongoing efforts to reduce the disparity in which two different forms of the same substance are treated under the Guidelines, it remains a fact that cocaine is a dangerous and addictive drug that tears at the social fabric of our communities")(citation omitted).

   **(C) The Characteristics of the Defendant**.  Another important aspect of this sentencing is the relevant characteristics of the defendant other than the criminal history issues discussed above.  See 18 U.S.C. §3553 (a)(1).   The absence of any substantial verified employment history is a matter of concern. PSR at ¶¶154-157 (description of work history).  As is his refusal to comply with probation conditions in the past, and anger management, substance abuse, and domestic violence issues.  See PSR at ¶¶60, 65, 69 (descriptions of defendant's probation violations as recent as 11/7/06);. See also PSR at ¶¶140-149 (substance abuse information).

The government recommends that the defendant be prohibited from using alcohol while on supervised release. See PSR at ¶97 (defendant's girlfriend quoted in BPD Incident Report as telling police that defendant had been drinking and that, "when he drinks, he starts running off at the mouth"). The defendant should also be required to undergo mental health counseling and anger management therapy both in prison and while on supervised release. Id. at ¶126 (girlfriend acknowledges that defendant has "a lot of anger in him"). These recommendations are of course in addition to the recommendation that the defendant be provided with all available substance abuse treatment and testing.

**(D).  Continued Vocational training**.  The defendant should be required to participate in any available vocational training that may be available to him while on supervised release.

**(E).  Employment**.  The defendant should be required to seek and maintain employment while on supervised release.

**(F).  Other conditions.** The forgoing recommended conditions are in addition to others that the court would ordinarily impose in a case such as this.

## CONCLUSION

As in any other proceeding, the search here is for a reasonable and just sentence that reflects the seriousness of both the offense and the defendant. Here, the amount of drugs is small. Yet the offenses are serious and persistent. As is the

defendant and his record of violence and drug trafficking.  The government asks that the Court's sentence reflect all of these factors.  To the extent that the Court varies from the advisory guideline range, the period of supervised release should be commensurately increased so as to minimize the risk that the defendant will not re-offend when he is released from prison.

                                  Respectfully submitted,

                                  MICHAEL J. SULLIVAN
                                UNITED STATES ATTORNEY

                  By:   /s/ John A. Wortmann, Jr.
                        JOHN A. WORTMANN, JR.
                        Assistant U.S. Attorney
                        One Courthouse Way
                        Boston, MA
                        (617) 748-3207